Robert BOND, Petitioner,

v.

Hans G. WALKER, Respondent.

No. 97 Civ. 3026(LMM).

United States District Court,
S.D. New York.

Sept. 27, 1999.

Robert Bond, Gowanda, NY, plaintiff pro se.

Efrem Z. Fischer, Asst. Attorney General, New York City, for defendant.

## MEMORANDUM AND ORDER

McKENNA, District Judge.

By Report and Recommendation dated August 16, 1999 (the "Report"), Magistrate Judge Peck recommended that the above petition for a writ of habeas corpus be denied. By order dated August 25, 1999, this Court extended petitioner's time to file objections to the Report to September 7, 1999. No objections having been filed, and upon consideration of the Report, this Court accepts the recommendation of the Magistrate Judge.

The writ is denied and the petition is dismissed.

SO ORDERED.

## REPORT AND RECOMMENDATION

PECK, United States Magistrate Judge.

Petitioner Robert Bond seeks a writ of habeas corpus from his conviction for first degree robbery, for which he was sentenced to twenty years to life imprisonment. (Pet.¶¶ 3, 4.) Bond's habeas corpus petition raises three grounds: (1) the in-court identification by the victim's mother was done under highly suggestive circumstances (Pet.¶ 12(A); Bond Br. at 17–20); (2) the line-up at which Bond was identified by the victim was impermissibly suggestive and tainted her in-court identification (Pet.¶ 12(B); Bond Br. at 12–16); and (3) Bond's guilt was not proved beyond a reasonable doubt (Pet.¶ 12(C); Bond Br. at 7–11).

Bond never presented his second (victim's identification) and third (sufficiency of the evidence) habeas grounds to any state court. He is procedurally barred from raising those claims now in state court, so they are deemed exhausted, and his procedural default also bars federal habeas review of these claims. The remaining claim, concerning the victim's mother's in-court identification, lacks merit. Accordingly, for the reasons set forth below, the Court should deny Bond's petition.

## FACTS

On January 1, 1983, Robert Bond attacked Cynthia Noble and robbed her of a gold chain at knife point. (*E.g.*, Trial Transcript ["Tr."] 39–44, 102–08.)

### The Trial Evidence of the Robbery

On December 31, 1982, Cynthia Noble ("Cynthia") left her young son with her mother, Mary Noble ("Mary"), and attended a New Year's Eve party in Mary's building.[1] (Tr. 32, 161–62.) After the party, Cynthia briefly went back to Mary's apartment, and then left, alone, for her apartment at "around 6:30" in the morning of January 1, 1983. (Tr. 33–34, 38, 104, 162.) Cynthia entered the lobby of her building, heard somebody follow her in, "spun around" to see who it was, and saw "a man standing up against the wall." (Tr. 38–39, 54, 102.) Cynthia tried to leave the building when the man suddenly "knocked [her] from behind and just started choking [her]." (Tr. 39–40, 102.) He held a knife to her neck and said " '[a]ll I want is your money.' " (Tr. 40.) He pushed her out of the building at knifepoint, and tried to push her into the next building. (Tr. 41.) Cynthia refused to continue, and "just collapsed on him," that is, "just fell flat down." (Tr. 42.)

The man pulled Cynthia by her hair and collar, causing a gold chain around her neck to snap and fall. (Tr. 42–43.) The attacker pocketed the chain, and threatened to "cut [her] open [and] hurt [her]. It doesn't make any difference to me." (Tr. 43.) When the attacker bent down to pick up the chain, Cynthia "did get a look at him." (Tr. 44, 107–08.) Cynthia identified Bond as the attacker. (Tr. 44.)

Bond forced Cynthia at knife point to walk down the block; Cynthia struggled and slipped, and they both "tumbled down into [a] basement." (Tr. 46.) Bond pulled her up and he "slammed [her] up against the wall." (Tr. 46, 47.) He dragged Cynthia down the street, holding her by the hair, with a knife held to her side and throat. (Tr. 48–49.) Bond tried forcing her into her own building's basement, but she resisted. (Tr. 49–50.)

At this point, Cynthia's sister and the sister's boyfriend approached them, causing the attacker to run away. (Tr. 50.) Cynthia again got a clear look at him: "[h]e was right in [her] face .... maybe seven, eight inches [away]." (Tr. 51–52, 105–07.) Cynthia also described the jacket that her attacker was wearing: "[t]he jacket was like a cream-colored beige knit cuff and waistband." (Tr. 52, 87.)

A short while after Cynthia left Mary's apartment, another of Mary's daughters telephoned from Cynthia's apartment and said that Cynthia had not arrived. (Tr. 163–64.) Mary grew "concerned," and looked out her window for Cynthia. (Tr. 164–65.) Mary observed the crime and the attacker's identity from the window:

I saw this guy with his arm sort of around [Cynthia's] head and her head was kind of bent over and he was bent over her.... [W]hen she got closer, I noticed that she seemed to be trying to come off the curb and this person was holding her ... and then he yanked her.

So, when he yanked her like hat, I knew he really wasn't a friend of hers.... So then I got out on the fire

---

1. The Court does not mean any disrespect by calling the victim and her mother by their first names, but does so only to easily distinguish between them, since they have the same last name.

escape ... I got out to get closer to try to see who he was.

. . . .

He was trying to push her toward the basement, their basement.

Q   Who was trying to push her towards the basement?

A   This guy over here.

Q   Do you recognize this as the same man that you saw?

A   He doesn't have the hair but his face is the same.

. . . .

He shoved Cynthia down the stairs into the basement and in shoving Cynthia, he fell.  So, the two of them tumbled down. ... [A]nd then he pushed up with his hands and when he was laying there, that's when I saw what he looked like.

. . . .

Q   Can you tell whether you see in court today the person you have been describing?

A   Yes. He is sitting over there.

[PROSECUTOR]:  Indicating for the record, the defendant.

. . . .

THE WITNESS:  His hair is not the same, but his face is the same.

(Tr. 165–66, 168–71.)

Mary's description of the perpetrator's jacket was consistent with Cynthia's: "beige, sort of a beige—I thought at the time it was a little creamy beige and it—the cuffs, knitted cuffs and the waist was knitted and also in the front it had like this knit, same knit, but it was like darker." (Tr. 172.)

A neighbor, Frank Drew, found a jacket in the building's lobby on the morning of the robbery. (Tr. 229–35.)  He gave it to Mary, who recognized it as "identical to the jacket that we had seen the guy wearing."  (Tr. 179, 233–34.)  Cynthia also identified the jacket as belonging to her attacker.  (Tr. 85–86.)  Mary, Cynthia, and Drew testified that they found Bond's social security card and other papers bear-ing Bond's name in the jacket's pocket. (Tr. 87–90, 180–82, 233.)  Cynthia called the police and gave them the jacket.  (Tr. 70–91.)  A police detective testified at trial that the number on the card was identical to the social security number that Bond gave the police when he was arrested. (Tr. 210–11, 215–16.)

On January 13, 1983, twelve days after the crime, Cynthia identified Bond as her attacker from a police lineup of six men, despite the fact that he had changed his hairstyle from "an uncombed Afro" to "corn braids."  (Tr. 92, 95, 106, 111–13.)

### Mary Noble's Trial Identification of Bonds

In anticipation of the prosecution' calling Mary Noble, defense counsel argued, on the first day of trial, that any in-court identifications would occur under highly suggestive circumstances.  (Tr. 118–31.) Bond's counsel noted that Mary had not seen the attacker for the ten months be-tween the crime and trial, and seeing someone in the defendant's seat obviously would be suggestive.  (E.g., Tr. 118–19, 123.)  Defense counsel analogized to a one-person showup by the police in which the police said, " 'We arrested this guy and charged him with the crime, is this the guy who committed the crime?,' " which would be a tainted identification.  (Tr. 119.) Bond's counsel suggested that a lineup be held:

> THE COURT: It is your position that the law is that for every witness to a crime, that witness must first view a line-up before he could be permitted to testify at trial?
>
> [DEFENSE COUNSEL]:  Absolute-ly.

(Tr. 120.)  The prosecutor responded that "it is daily routine to have witnesses take the stand who haven't been subject to a pre-trial identification procedure and then to ask them whether they see the defen-dant in Court," and any suggestiveness arguments are for the jury to determine. (Tr. 123–24.)  The trial judge raised the

possibility of seating Bond in the spectator section of the courtroom (Tr. 125–26), but the prosecutor and Bond himself objected. (Tr. 127–28, 133.) The trial judge took the issue under advisement, and gave the parties a day off to brief it. (Tr. 130–31.)

When counsel returned to court, defense counsel argued that even if Bond were allowed to sit in the spectator section, he would be alone and so the in-court identification would be unfairly suggestive. (Tr. 135–37.) The prosecutor again responded that in-court identifications happen every day in New York courts. (Tr. 137.) The prosecutor also informed the court that he had instructed Cynthia not to talk to the other witnesses, and he had cautioned the other witnesses about the need to be certain of any identification. (Tr. 138–39.)

The trial court ruled that "there is no such right to have a procedure of this type [*i.e.*, a lineup type procedure] at a trial stage." (Tr. 144.) The trial court further held that it would not be improper to have the defendant sit in the spectator section, "but it is certainly not required," and since there were no other spectators, such a procedure would be "academic" and serve no useful purpose. (Tr. 144.) The trial judge held that defense counsel would "have an opportunity now to cross-examine [the] witness, to be able to show ability or lack of ability to make a proper identification, and [defense] Counsel will have a further opportunity in summation to argue to the jury," but that "there is no additional steps that need be taken by this Court to assure the fairness to this Defendant." (Tr. 145.) Bond's counsel excepted to the ruling. (Tr. 145.)

Mary Noble's testimony identifying Bond as the attacker is described at pages 289–90 above.

*Bond's Conviction and Sentencing*

On October 31, 1983, the jury convicted Bond of first degree robbery. (Tr. 544–45.) On November 21, 1983, the trial court sentenced Bond to twenty years to life imprisonment. (11/21/83 Sentencing Tr. 29.)

*Bond's Direct Appeal*

Bond appealed to the First Department, arguing that the trial court violated his Fifth Amendment rights by allowing "an in-court identification by a witness who had negligeable [sic] opportunity to observe the perpetrator of the crime." (Affidavit of ADA Efrem Z. Fischer, dated 12/10/98, Ex. A: Bond 1st Dep't Br. at 6.) As part of this argument, Bond claimed that it was "error to have allowed [Mary Noble] to identify [Bond] in the suggestive show-up situation of the trial." (*Id.* at 7.)

On April 11, 1985, the First Department affirmed Bond's conviction without opinion. *People v. Bonds*, 110 A.D.2d 1090, 488 N.Y.S.2d 529 (1st Dep't 1985) (table). The First Department adhered to its original determination on reargument. *People v. Bonds*, 114 A.D.2d 303, 493 N.Y.S.2d 757 (1st Dep't 1985). On April 30, 1985, Bond filed a motion in the New York Court of Appeals, pursuant to CPL § 460.20, claiming ineffective assistance of trial and appellate counsel in connection with the victim's lineup and in-court identifications. (Bond 5/21/99 Aff. & attached 4/30/85 CPL § 460.20 Motion papers at 2–3.) On December 12, 1985, the New York Court of Appeals denied Bond's application for leave to appeal (and, presumably, his CPL § 460.20 application). *People v. Bonds*, 66 N.Y.2d 1038, 499 N.Y.S.2d 1035, 489 N.E.2d 1307 (1985). The U.S. Supreme Court denied certiorari in March 1986. (Pet. ¶ 9(F).) *Bond v. New York*, 475 U.S. 1097, 106 S.Ct. 1497, 89 L.Ed.2d 897 (1986).[2]

---

**2.** According to Bond's petition, he filed a collateral attack pursuant to CPL § 440.10 in the trial court, asserting two grounds: (1) ineffective assistance of counsel; and (2) his arrest violated the Fourth Amendment. (Pet.

¶ 11(A).) Neither the counsel who was appointed to represent Bond in the Second Circuit, nor the State, address the § 440.10 motion, which does not appear to be relevant to the issues presently before the Court.

### Bond's Present Federal Habeas Corpus Petition and Federal Court Proceedings

Bond's habeas corpus petition is dated April 14, 1997 and was received by the Court's pro se office on April 22, 1997. (Pet. at pp. 2, 7.) Bond's petition alleges three grounds: (1) the in-court identification by the victim's mother was done under highly suggestive circumstances (Pet. ¶ 12(A); Bond Br. at 17–20); (2) the line-up at which Bond was identified by the victim was impermissibly suggestive and tainted her in-court identification of Bond (Pet.¶ 12(B); Bond Br. at 12–16); and (3) Bond's guilt was not proved beyond a reasonable doubt (Pet.¶ 12(C); Bond Br. at 7–11).

By Opinion and Order dated May 7, 1998, Judge McKenna dismissed Bond's petition for failure to comply with the statute of limitations set by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), as then interpreted by the Second Circuit in *Peterson v. Demskie*, 107 F.3d 92, 93 (2d Cir.1997). *Bond v. Walker*, 97 Civ. 3026, 1998 WL 229505 at *1 (S.D.N.Y. May 7, 1998).

The Second Circuit appointed counsel to represent Bond on appeal. (*See* Bond Br. at 3.) In light of the Second Circuit's decision in *Ross v. Artuz*, 150 F.3d 97 (2d Cir.1998), that a petitioner whose conviction became final before the AEDPA's enactment has until April 24, 1997 to bring a federal habeas petition, the Second Circuit remanded to this Court. (Dkt. No. 12: 2d Cir. Mandate.)

Bond's appellate counsel filed a brief in support of Bond's petition. (Dkt. No. 14: Bond 10/27/98 Br.) Judge McKenna directed the State to respond to the petition (Dkt. No. 13: 10/26/98 Order), which the State did on December 10, 1998 (Dkt. No. 15–16).

On March 19, 1999, Bond filed a pro se motion to hold his habeas petition in abeyance to allow him to exhaust claims of ineffective assistance of appellate counsel in state court. (Dkt. No. 18: Bond 3/19/99 Stay Motion Papers.) Bond claimed that appellate counsel was ineffective for not raising on direct appeal a claim that Cynthia Noble's pretrial lineup and identification of him was unduly suggestive and tainted her trial identification. (*Id.*)

This Court denied Bond's motion, holding:

By motion dated March 19, 1999, petitioner Robert Bond seeks to have the Court hold his pending federal habeas corpus petition in abeyance to allow him to present unexhausted claims in his petition in state court. For the reasons set forth below, the motion is ***DENIED***.

As this Court previously stated, "the Court will not allow the AEDPA's statute of limitations to be circumvented by permitting a petitioner to file a habeas petition containing . . . unexhausted claims, and then holding that petition in suspense until the petitioner exhausts state remedies." *Cowans v. Artuz*, 14 F.Supp.2d 503, 508 (S.D.N.Y.1998) (Preska, D.J. & Peck, M.J.); *see also, e.g., Espinal v. Walker*, 97 Civ. 3187, 1998 WL 151273 at *4 & n. 6 (S.D.N.Y. March 27, 1998) (Patterson, D.J. & Peck, M.J.) ("if [petitioner's] present habeas petition were timely . . . and he had a pending state application for collateral review (as opposed to one he merely planned to file), that would appear to stay (*i.e.,* extend) the AEDPA's one-year statute of limitations period, so that there would be *no need to file* an unexhausted petition in federal court and keep it on suspense until decision of the state petition").

*Bond v. Walker*, 97 Civ. 3026, 1999 WL 228398 at *1 (S.D.N.Y. April 19, 1999) (Peck, M.J.). The Court gave Bond several options, including (a) dismissing his petition without prejudice, (b) withdrawing his unexhausted claims, or (c) having the Court consider the petition as is. *Id.*

Bond's response asked the Court to rule on all three of the claims raised in his petition. (Bond 5/21/99 Aff. at p. 4.) Bond claimed that the victim's lineup identifica-

tion issue was raised in the New York Court of Appeals through his pro se motion pursuant to CPL § 460.20. (Bond 5/21/99 Aff. at p. 4 & attached 4/30/85 CPL § 460.20 Motion Papers at pp. 2–3.)

## ANALYSIS

### I. *BOND'S SECOND (VICTIM'S LINE-UP IDENTIFICATION) AND THIRD (SUFFICIENCY OF THE EVIDENCE) HABEAS CLAIMS SHOULD BE DENIED AS PROCEDURALLY BARRED BECAUSE OF BOND'S FAILURE TO ADEQUATELY PRESENT THEM TO STATE COURT*

#### A. *Applicable Legal Standards*

Section 2254 codifies the exhaustion requirement, providing that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—(A) the applicant has exhausted the remedies available in the courts of the State; . . . ." 28 U.S.C. § 2254(b)(1)(A); *see, e.g., O'Sullivan v. Boerckel,* 526 U.S. 838, 119 S.Ct. 1728, 1731, 144 L.Ed.2d 1 (1999); *Rose v. Lundy,* 455 U.S. 509, 515–16, 102 S.Ct. 1198, 1201, 71 L.Ed.2d 379 (1982) ("The exhaustion doctrine existed long before its codification by Congress in 1948 ... in 28 U.S.C. § 2254."); *Picard v. Connor,* 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971); *Bossett v. Walker,* 41 F.3d 825, 828 (2d Cir.1994), *cert. denied,* 514 U.S. 1054, 115 S.Ct. 1436, 131 L.Ed.2d 316 (1995); *Pesina v. Johnson,* 913 F.2d 53, 54 (2d Cir.1990); *Daye v. Attorney General,* 696 F.2d 186, 190–94 (2d Cir.1982) (en banc), *cert. denied,* 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984); *Orraca v. Walker,* 98 Civ. 4459, 1999 WL 427992 at *5–6 (S.D.N.Y. June 18, 1999) (McKenna, D.J. & Peck, M.J.); *Otero v. Stinson,* 97 Civ. 2794, 1999 WL 412865 at *4–5 (S.D.N.Y. April 27, 1999) (Baer, D.J. & Peck, M.J.); *Jordan v. Lefevre,* 22 F.Supp.2d 259, 266 (S.D.N.Y.1998) (Mukasey, D.J. & Peck, M.J.). As the Supreme Court has made clear, "[t]he exhaustion doctrine is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings." *Rose v. Lundy,* 455 U.S. at 518, 102 S.Ct. at 1203, *accord, e.g., O'Sullivan v. Boerckel,* 119 S.Ct. at 1732; *Jordan v. Lefevre,* 22 F.Supp.2d at 266.

The Second Circuit determines whether a claim has been exhausted by applying a two-step analysis:

First, the petitioner must have fairly presented to an appropriate state court the same federal constitutional claim that he now urges upon the federal courts. . . . Second, having presented his federal constitutional claim to an appropriate state court, and having been denied relief, the petitioner must have utilized all available mechanisms to secure [state] appellate review of the denial of that claim.

*Diaz v. Coombe,* 97 Civ. 1621, 1997 WL 529608 at *3 (S.D.N.Y. June 12, 1997) (Mukasey, D.J. & Peck, M.J.) (quoting *Klein v. Harris,* 667 F.2d 274, 282 (2d Cir.1981)); *accord, e.g., O'Sullivan v. Boerckel,* 119 S.Ct. at 1732–34; *Jordan v. Lefevre,* 22 F.Supp.2d at 266; *Boyd v. Hawk,* 94 Civ. 712, 1996 WL 406680 at *3 (S.D.N.Y. May 31, 1996) (Batts, D.J. & Peck, M.J.); *Ehinger v. Miller,* 928 F.Supp. 291, 293 (S.D.N.Y.1996) (Mukasey, D.J. & Peck, M.J.).

"The exhaustion requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts." *Daye v. Attorney General,* 696 F.2d at 191; *accord, e.g., O'Sullivan v. Boerckel,* 119 S.Ct. at 1732; *Picard v. Connor,* 404 U.S. at 275–76, 92 S.Ct. at 512; *Jones v. Vacco,* 126 F.3d 408, 413 (2d Cir.1997); *Diaz v. Coombe,* 1997 WL 529608 at *3. The Second Circuit has held that a federal habeas petitioner must have alerted the state appellate court that a federal constitutional claim is at issue. *E.g., Jones v. Vacco,* 126 F.3d at 413–14 (2d Cir.1997); *Grady v. LeFevre,* 846 F.2d 862, 864 (2d Cir.1988);

*Petrucelli v. Coombe,* 735 F.2d 684, 688–89 (2d Cir.1984); *Daye v. Attorney General,* 696 F.2d at 191; *Diaz v. Coombe,* 1997 WL 529608 at *3.

In *Daye,* the Second Circuit en banc stated:

> [T]he ways in which a state defendant may fairly present to the state courts the constitutional nature of his claim, even without citing chapter and verse of the Constitution, include (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

*Daye v. Attorney General,* 696 F.2d at 194; *accord, e.g., Levine v. Commissioner of Correctional Servs.,* 44 F.3d 121, 124 (2d Cir.1995); *Grady v. LeFevre,* 846 F.2d at 864; *Garofolo v. Coomb,* 804 F.2d 201, 206 (2d Cir.1986); *Jordan v. Lefevre,* 22 F.Supp.2d at 266; *Diaz v. Coombe,* 1997 WL 529608 at *3; *Washington v. Superintendent, Otisville Correctional Facility,* 96 Civ. 2729, 1997 WL 178616 at *3–4 (S.D.N.Y. April 11, 1997); *Boyd v. Hawk,* 1996 WL 406680 at *3.

" 'For exhaustion purposes, "a federal habeas court need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred." ' " *Reyes v. Keane,* 118 F.3d 136, 139 (2d Cir.1997) (quoting *Grey v. Hoke,* 933 F.2d 117, 120 (2d Cir.1991) (quoting *Harris v. Reed,* 489 U.S. 255, 263 n. 9, 109 S.Ct. 1038, 1043 n. 9, 103 L.Ed.2d 308 (1989))); *accord, e.g., Castille v. Peoples,* 489 U.S. 346, 350, 109 S.Ct. 1056, 1059, 103 L.Ed.2d 380 (1989) ("It would be inconsistent with

[§ 2254(b) ], as well as with underlying principles of comity, to mandate recourse to state collateral review whose results have effectively been predetermined."); *Bossett v. Walker,* 41 F.3d at 828 ("if the petitioner no longer has 'remedies available' in the state courts under 28 U.S.C. § 2254(b), we deem the claims exhausted"); *Jordan v. Lefevre,* 22 F.Supp.2d at 269; *Redd v. Quinones,* 98 Civ. 2604, 1998 WL 702334 at * 3 (S.D.N.Y. Oct.7, 1998); *Benitez v. Senkowski,* 97 Civ. 7819, 1998 WL 668079 at *8 n. 7 (S.D.N.Y. Sept.17, 1998) (Cote, D.J. & Peck, M.J.); *Chisolm v. Costello,* 94 Civ. 3201, 1998 WL 167332 at *3 (S.D.N.Y. Apr.8, 1998); *Underwood v. Artuz,* 95 Civ. 7866, 1996 WL 734898 at *2 (S.D.N.Y. Dec.24, 1996). "In such a case, a petitioner no longer has 'remedies available in the courts of the State' within the meaning of 28 U.S.C. § 2254(b)." *Grey v. Hoke,* 933 F.2d at 120. Consequently, such procedurally barred claims are "deemed exhausted" by the federal courts. *Reyes v. Keane,* 118 F.3d at 139; *see also, e.g., Bossett v. Walker,* 41 F.3d at 828; *Washington v. James,* 996 F.2d 1442, 1446–47 (2d Cir.1993), *cert. denied,* 510 U.S. 1078, 114 S.Ct. 895, 127 L.Ed.2d 87 (1994); *Grey v. Hoke,* 933 F.2d at 120–21; *Jordan v. Lefevre,* 22 F.Supp.2d at 269; *Redd v. Quinones,* 1998 WL 702334 at *3.

### B. *Bond's Sufficiency of the Evidence Claim Was Not Exhausted*

■ Bond's federal habeas petition alleges that his guilt was not proved beyond a reasonable doubt, *i.e.,* that the evidence was insufficient to convict him. (Pet. ¶ 12(C); Bond Br. at 7–11.)

Bond's insufficiency of the evidence claim could have been raised on direct appeal, but was not, and therefore cannot be raised in a collateral attack pursuant to CPL § 440.10.[3] That claim, therefore, is

---

**3.** New York CPL § 440.10(2)(c) states in pertinent part:

> 2. Notwithstanding the provisions of subdivision one, the court must deny a motion to vacate a judgment when:

. . . .

> (c) Although sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the

unexhausted and procedurally defaulted. The Second Circuit has explained:

> While New York provides a mechanism for collaterally attacking a judgment that is in violation of constitutional rights, *see* N.Y.Crim.Proc.Law § 440.10(1)(h) (McKinney 1994), any attempt by [the petitioner] to bring such a [§ 440.10] motion would be futile. Section 440.10(2)(c) of New York's Criminal Procedure Law mandates that the state court deny any 440.10 motion where the defendant unjustifiably failed to argue such constitutional violation on direct appeal despite a sufficient record. *See Levine v. Commissioner of Correctional Servs.*, 44 F.3d 121, 126 (2d Cir.1995) (refusing to conduct federal habeas review where New York's appellate court found claim to be procedurally barred under § 440.10(2)(c)); *People v. Santillana*, 145 Misc.2d 567, 547 N.Y.S.2d 981, 982 (Sup.Ct.1989) (barring claims pursuant to § 440.10(2)(c) that were not raised on direct appeal despite sufficient facts in record to allow defendant to do so.) ... [The petitioner] is therefore deemed to have exhausted his state remedies for the ineffective assistance claim by his procedural default on that issue.

*Reyes v. Keane*, 118 F.3d 136, 139–40 (2d Cir.1997); *accord, e.g., Monroig v. Mann*, No. 95–2368, 101 F.3d 107 (table), 1996 WL 107289 at *2 (2d Cir.1996) ("we hold that [petitioner] is procedurally barred from raising this claim because he failed to raise the issue on direct appeal. *See* N.Y.Crim.Proc.Law § 440.10(2)(c) (foreclosing litigation of an issue on collateral review that could have been raised on di-

> ground or issue raised upon the motion, no such appellate review or determination occurred owing to the defendant's unjustifiable failure to ... raise such ground or issue upon an appeal actually perfected by him. ...

New York law bars consideration via collateral attack of an issue that could have been raised on direct appeal. N.Y. CPL § 440.10(2)(c); *see, e.g., People v. Cooks*, 67 N.Y.2d 100, 103–04, 500 N.Y.S.2d 503, 505, 491 N.E.2d 676 (1986); *People v. Byrdsong*, 234 A.D.2d 468, 469, 651 N.Y.S.2d 903, 903

rect appeal)"); *Levine v. Commissioner of Correctional Servs.*, 44 F.3d 121, 126 (2d Cir.1995); *Bossett v. Walker*, 41 F.3d 825, 828–29 (2d Cir.1994), *cert. denied*, 514 U.S. 1054, 115 S.Ct. 1436, 131 L.Ed.2d 316 (1995); *Avincola v. Stinson*, 97 Civ. 1132, 1999 WL 557965 at *16 (S.D.N.Y. July 9, 1999) (Scheindlin, D.J. & Peck, M.J.); *Haywood v. Senkowski*, 96 Civ.2099, 1998 WL 214878 at *2 (S.D.N.Y. April 28, 1998) ("A federal court ... 'need not require that a federal claim be presented to a state court if it is clear that the state court would hold the claim procedurally barred.' ... It is clear that New York courts would hold [petitioner's] claim procedurally barred as it was not raised in his direct appeal and there was a sufficient record upon which he could have raised the claim."); *Chisolm v. Costello*, 94 Civ. 3201, 1998 WL 167332 *3 (S.D.N.Y. April 8, 1998); *Simmons v. Ross*, 965 F.Supp. 473, 477–78 (S.D.N.Y.1997); *Loving v. O'Keefe*, 960 F.Supp. 46, 48 (S.D.N.Y.1997); *Ramos v. Costello*, 96 Civ. 3659, 1997 WL 231129 at *2 (S.D.N.Y. May 7, 1997).

The insufficiency of the evidence claim thus is procedurally barred and deemed exhausted.

### C. *Bond's Challenge to Cynthia Noble's Identification Was Not Exhausted*

■ Bond's petition also challenges victim Cynthia Noble's line-up identification and trial identification of him as tainted. (Pet.¶ 12(B); Bond Br. at 12–16.) That claim was not raised in Bond's direct appeal to the First Department; it was

(2d, Dep't 1996) ("Pursuant to CPL 440.10(2)(c) a court must deny a post-judgment motion to vacate a conviction when sufficient facts appear in the record so that an issue may be adequately reviewed on a direct appeal and the defendant unjustifiably failed to raise the claim on appeal."); *People v. Skinner*, 154 A.D.2d 216, 221, 552 N.Y.S.2d 932, 935 (1st Dep't 1990) ("defendant's failure to present his constitutional attack upon his conviction after trial in the course of his direct appeal forecloses any consideration of it [in a § 440.10 proceeding]").

raised only in Bond's pro se CPL § 460.20 application for leave to appeal to the New York Court of Appeals, and raised only in the form of an ineffective assistance of appellate counsel claim. (*See* pages 7–8 above.) The claim, therefore, is not exhausted.

The line-up identification issue could have been raised on direct appeal, since the facts necessary for review of the claim were contained in the record. Thus, because the claim could have been but was not raised on direct appeal, it is deemed exhausted and procedurally defaulted. *See* discussion and citations in Point I.B, above.

■ Bond's CPL § 460.20 application to the New York Court of Appeals does not change the result, for two reasons. First, Bond did not directly raise the pretrial identification claim in his CPL § 460.20 motion. Rather, he raised an ineffective assistance of appellate counsel claim (premised on an underlying substantive claim involving Cynthia's pretrial identification). An ineffective assistance claim is separate and distinct from the substantive claim incorporated in the ineffective assistance claim, such that exhaustion of the ineffective assistance claim is not exhaustion of the underlying substantive claim.

■ Second, even if exhaustion of the ineffective assistance claim could exhaust the underlying substantive claim, Bond did not "fairly present" the ineffective assistance claim in state court, since he raised his ineffective assistance claim by an improper means and in the wrong court. The New York Court of Appeals has explained that:

> [A] common-law coram nobis proceeding brought in the proper appellate court is the only available and appropriate procedure and forum to review a claim of ineffective assistance of appellate counsel until such time as the Legislature enacts a particular and comprehensive remedy. The absence of a codified form of relief and the long-standing recogni-

tion of coram nobis flexibility help lead us to the conclusion that challenges to an intermediate appellate court determination, based upon a claim of ineffective assistance of appellate counsel, whether appointed or retained, should be initiated by writ of error coram nobis before that very court.

*People v. Bachert,* 69 N.Y.2d 593, 595–96, 516 N.Y.S.2d 623, 624–25, 509 N.E.2d 318 (1987); *accord, e.g., Garcia v. Scully,* 907 F.Supp. 700, 703, 706–07 (S.D.N.Y.1995) ("The issue of whether appellate counsel was ineffective, … pursuant to New York law, … must be presented to the Appellate Division. The only procedure in New York for doing so is an application for a writ of error coram nobis to the Appellate Division department that confirmed the conviction."); *Gil v. Kelly,* No. CV–90–0603, 1992 WL 151901 at *3 (E.D.N.Y. June 16, 1992) (" 'a common law coram nobis proceeding brought in the proper appellate court is the only available and appropriate procedure and forum to review a claim of ineffective assistance of appellate counsel.' … Petitioner has never availed himself of a state coram nobis proceeding. Under these circumstances, the state courts have not had a fair opportunity to pass on this claim."); *Bentley v. Scully,* 91 Civ. 1868, 1991 WL 183357 at *5 (S.D.N.Y. Sept.11, 1991) ("although [petitioner] raised the ineffective assistance of appellate counsel claims in two of his CPL § 440.10 motions before the trial court, that court was without jurisdiction to entertain these claims under *Bachert*"); *Blount v. Keane,* No. CV–89–2449, 1990 WL 3569 at *1 (E.D.N.Y. Jan. 8, 1990).

"There is no authority for initiating a writ of error coram nobis in the Court of Appeals." *People v. Claudio,* 77 N.Y.2d 988, 988, 571 N.Y.S.2d 899, 899, 575 N.E.2d 385 (1991); *accord, e.g., Garcia v. Keane,* 973 F.Supp. 364, 370–71 & n. 6 (S.D.N.Y.1997) (even where ineffective assistance of appellate counsel allegedly occurred in Court of Appeals, it is "eminently clear" that writ of error coram nobis

cannot be initiated in the Court of Appeals and · must be filed in the Appellate Division).

Here, Bond raised his ineffective assistance of appellate counsel claim in a CPL § 460.20 application to the Court of Appeals. However, the proper way to raise that claim is a petition for a writ of error coram nobis to the First Department.[4] Thus, Bond did not properly present his claim of ineffective assistance of appellate counsel to the state courts.

Accordingly, Bond's claim that Cynthia Noble's pretrial and in-court identifications of him were improper is deemed exhausted.

### D. *Bond's Sufficiency of Evidence and Cynthia Noble's Identification Claims Are Procedurally Barred*

■ "While petitioner's failure to 'fairly present' his claim in state court leads to a determination that the claim is [deemed] exhausted, at the same time this failure results in a procedural default of the claim." *Redd v. Quinones*, 98 Civ. 2604, 1998 WL 702334 at *3 (S.D.N.Y. Oct.7, 1998) (citing *Bossett v. Walker*, 41 F.3d at 829, & *Grey v. Hoke*, 933 F.2d 117, 121) (2d Cir.1991)), *accord, e.g., Avincola v. Stinson*, 97 Civ. 1132, 1999 WL 557965 at *16 (S.D.N.Y. July 9, 1999) (Scheindlin, D.J. & Peck, M.J.); *Jordan v. Lefevre*, 22 F.Supp.2d 259, 269 (S.D.N.Y.1998) (Mukasey, D.J. & Peck, M.J.). A federal court may not reach the merits of a procedurally defaulted claim "unless the habeas petitioner can show 'cause' for the default and

'prejudice attributable thereto,' or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice,' " *i.e.*, a showing of "actual innocence." *Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989) (citations omitted); *accord, e.g., Schlup v. Delo*, 513 U.S. 298, 324–27, 115 S.Ct. 851, 865–67, 130 L.Ed.2d 808 (1995); *Coleman v. Thompson*, 501 U.S. 722, 735, 111 S.Ct. 2546, 2557, 115 L.Ed.2d 640 (1991); *Jones v. Vacco*, 126 F.3d 408, 415 (2d Cir.1997); *Glenn v. Bartlett*, 98 F.3d 721, 724 (2d Cir.1996), *cert. denied*, 520 U.S. 1108, 117 S.Ct. 1116, 137 L.Ed.2d 317 (1997); *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir.1990).[5]

■ Bond has not shown cause and prejudice or a fundamental miscarriage of justice/actual innocence. Reading Bond's pro se papers liberally (as the Court is required to do), Bond alleges that ineffective assistance of appellate counsel was the "cause" for his default as to the Cynthia Noble lineup identification claim. (*See* Dkt. No. 18: Bond 3/19/99 Stay Motion papers; Bond 5/21/99 Aff. at p. 4 & attached 4/30/85 CPL § 460.20 Motion Papers.)

Ineffective assistance of counsel can represent cause for a procedural default. *See, e.g., Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 2646, 91 L.Ed.2d 397 (1986) ("Ineffective assistance of counsel, then, is cause for a procedural default."); *Reyes v. Keane*, 118 F.3d 136, 139 (2d Cir.1997); *Avincola v. Stinson*, 1999 WL 557965 at

---

4. Because there is no time limit for such a petition, the ineffective assistance claim can still be raised in state court, *see, e.g., Blount v. Keane*, 1990 WL 3569 at *1, as Bond recognized in seeking to stay this habeas petition to allow him to exhaust his ineffective assistance claim in state court. (*See* page 9 above.) The ineffective assistance claim is not now before this Court, and thus the fact that it is unexhausted does not affect the petition.

5. *See also, e.g., Avincola v. Stinson*, 1999 WL 557965 at *16; *Jordan v. Lefevre*, 22 F.Supp.2d at 266; *Torres v. Irvin*, 33 F.Supp.2d 257, 273–74 (S.D.N.Y.1998) (Cote,

D.J. & Peck, M.J.); *Williams v. Bennet*, No. 97 Civ. 1628, 1998 WL 236222 (S.D.N.Y. April 20, 1998) (Baer, D.J. & Peck, M.J.); *Farrington v. Senkowski*, 19 F.Supp.2d 176, 180 (S.D.N.Y.1998); *Cooper v. LeFevre*, No. 94–CV–5958, 1998 WL 386340 at *1–2 (E.D.N.Y. July 8, 1998); *Wells v. LeFavre*, 96 Civ. 3417, 1996 WL 692003 at *3 (S.D.N.Y. Dec. 2, 1996); *Vera v. Hanslmaier*, 928 F.Supp. 278, 285 (S.D.N.Y.1996) (Jones, D.J. & Peck, M.J.); *Liner v. Keane*, 95 Civ. 2738, 1996 WL 33990 at *7 (S.D.N.Y. Jan. 3, 1996) (Wood, D.J. & Peck, M.J.).

*10; *Simmons v. Ross,* 965 F.Supp. 473, 478 (S.D.N.Y.1997); *Hurd v. Keane,* 97 Civ. 2991, 1997 WL 582825 at *2 (S.D.N.Y. Sept. 17, 1997). "However, ... the exhaustion doctrine ... generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." *Murray v. Carrier,* 477 U.S. at 489, 106 S.Ct. at 2646; *Reyes v. Keane,* 118 F.3d at 139–40; *Avincola v. Stinson,* 1999 WL 557965 at *10; *Redd v. Quinones,* 1998 WL 702334 at *3; *Taylor v. Mitchell,* 939 F.Supp. 249, 255 (S.D.N.Y.1996); *Gaiter v. Lord,* 917 F.Supp. 145, 149 (E.D.N.Y.1996).

Bond has not presented an ineffective assistance claim in his present habeas petition. Indeed, his motion to hold this petition in abeyance recognized that his ineffective assistance claim has not been exhausted in state court and still may be brought in state court. (*See* Dkt. No. 18: Bond 3/15/99 Stay Motion papers.) *See, e.g., Blount v. Keane,* No. CV–89–2449, 1990 WL 3569 at *1 (E.D.N.Y. Jan. 8, 1990).

Thus, Bond's ineffective assistance claim cannot be used to establish cause for any procedural default, since it has not been presented to the state courts as an independent claim.

Accordingly, the Court should dismiss Bond's second (victim Cynthia Noble identification) and third (sufficiency of the evidence) claims as unexhausted but deemed exhausted and procedurally barred.

## II. *BOND'S IN–COURT IDENTIFICATION CLAIM LACKS MERIT*

Bond's remaining habeas ground—that the in-court identification by Mary Noble, the victim's mother, was unduly suggestive—was raised by Bond before the First Department (Fischer Aff.Ex. A: Bond 1st Dep't Br. at 6–7), and the State concedes that this claim was exhausted. (State Br. at 14–15.) Thus, the Court addresses the merits of this claim.

Few cases directly have addressed whether circumstances surrounding an in-court identification can be considered impermissibly suggestive. *See, e.g.,* Evan J. Mandery, "Legal Development: Due process Considerations of In–Court Identifications," 60 Alb.L.Rev. 389, 389 (1996) ("Yet, while the constitutional issues surrounding pre-trial identifications have been widely litigated and explored by scholars, little attention has been paid to the issues raised by in-court identifications. The lack of appellate case law on the subject may be partially explained by the fact that few defendants ever object to the suggestiveness of in-court identifications. The near complete absence of law review articles on the subject is somewhat understandable ...."). The Second Circuit, however, has addressed the issue, but only in review of a federal criminal prosecution, and limited its ruling to situations where the defendant has requested relief before trial.

### A. *The Second Circuit's Archibald Decision*

In *United States v. Archibald,* 734 F.2d 938 (2d Cir.1984), the defendant was concerned about the potential suggestiveness of the standard in-court identification and requested before trial that the district court allow him to sit away from the defense table and be "seated with five or six other black men who looked reasonably like him, to ensure that he would not be obviously singled out by an educated witness." *Id.* at 941. When the district court did not act upon this request, the defendant renewed the request at trial. *Id.* The district court denied the request, stating that it was " 'just absolutely inappropriate.' " *Id.* at 941, 943. At trial, three eyewitnesses, including a bank teller, identified defendant as the bank robber; defendant "was seated at the defense table" and "was the only black person in the courtroom, except for one day when a black United States Marshal was present." *Id.* at 940.

The Second Circuit found that the in-court identifications occurred under impermissibly suggestive circumstances, but held that the error was harmless in light of other strong evidence of Archibald's guilt. *Id.* at 942–43. The Second Circuit began by observing that the traditional seating of a defendant next to defense counsel makes in-court identification "obviously suggestive":

> The in-court identifications present us with a different problem. As is generally the case, *the defendant here was seated next to defense counsel during the trial, a circumstance obviously suggestive to witnesses asked to make in-court identifications.* Any witness, especially one who has watched trials on television, can determine which of the individuals in the courtroom is the defendant, which is the defense lawyer, and which is the prosecutor. In most cases, however, no objection is made to the fact that an identification occurs while the defendant is seated with defense counsel, probably because *this arrangement is traditional.*

*Id.* at 941 (emphasis added). The Second Circuit stated that its "concern with suggestive in-court identification procedures has been noted in a number of cases,"[6]

**6.** A brief discussion of the cases cited by the Second Circuit in *Archibald* is in order. In *United States v. Brown,* 699 F.2d 585, 593–94 (2d Cir.1983), which *Archibald* described as "the case which has considered the question most carefully in this circuit," *United States v. Archibald,* 734 F.2d at 942, the Second Circuit upheld a bank manager's in-court identification of the defendant bank robber. The Second Circuit held that a "defendant does not have a constitutional right to a line-up; his request is addressed to the trial court's sound discretion.... Nor does an in-court identification without a prior line-up or hearing violate a defendant's rights." *United States v. Brown,* 699 F.2d at 593–94. While the Second Circuit in *Brown* expressed its "view" that it would have been better for the prosecutor to offer a pretrial lineup (both to protect a defendant's rights and avoid litigation), the Second Circuit held that because the defendants failed to request a line-up before trial, their rights were not violated. The Court noted that "when a defendant is sufficiently aware in advance that identification testimony will be presented at trial and fears irreparable suggestivity, ... his remedy is to move for a line-up order to assure that the identification witnesses will first view the suspect with others of like description rather than in the courtroom sitting alone at the defense table." *Id.* at 594; *see also, e.g., United States v. Campbell,* 581 F.2d 22, 28 (2d Cir.1978) (in-court identification by bank teller not unfairly suggestive; there is no constitutional right to a line-up, and whether or not to order it is in trial judge's "sound discretion," which was not abused where defense counsel "did not request that [defendant] be accorded at trial the equivalent of a line-up, in or out of the jury's presence"); *United States v. Estremera,* 531 F.2d 1103, 1111–12 (2d Cir.) ("It is now established that a defendant has no constitutional right to a line-up.... However, a court-ordered line-up may be granted by the trial judge in the exercise of his discretion.... Whether [the district judge] abused his discretion [in denying the defense's pretrial request for a line-up] requires us to consider all relevant circumstances, including the adequacy and propriety of other identifications, the amount of time that had elapsed since the crime had occurred and the extent of change in the accused's appearance."), *cert. denied,* 425 U.S. 979, 96 S.Ct. 2184, 48 L.Ed.2d 804 (1976).

The Second Circuit in *Archibald* cited *United States ex rel. Phipps v. Follette,* 428 F.2d 912, 915 (2d Cir.), *cert. denied,* 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970), for Judge Friendly's observation that " 'there is always the question how far in-court identification is affected by the witness' observing the defendant at the counsel table.' " *United States v. Archibald,* 734 F.2d at 942. The issue in *Phipps,* however, was the more "traditional" inquiry of whether an in-court identification was proper after a suggestive pretrial identification procedure. *United States ex rel. Phipps v. Follette,* 428 F.2d at 915–16; *see also Boyd v. Henderson,* 555 F.2d 56, 61–62 (2d Cir.) (in court identification after prior suggestive identification, held harmless error), *cert. denied,* 434 U.S. 927, 98 S.Ct. 410, 54 L.Ed.2d 286 (1977); *United States v. Ravich,* 421 F.2d 1196, 1202 (2d Cir.) (cited by *Archibald* for the proposition that during a pretrial *Wade* hearing, defendants moved from counsel table to "less conspicuous positions in the courtroom," but were still identified by eyewitnesses during the hearing), *cert. denied,* 400 U.S. 834, 91 S.Ct. 69, 27 L.Ed.2d 66 (1970). The Second Circuit in *Archibald* also quoted dicta by Judge Friendly from *Brathwaite v. Manson,* 527 F.2d 363, 367 n. 6 (2d Cir.1975), *rev'd on other grounds,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140

and felt that the district judge "did not fully appreciate the concern that this court had shown with in-court identification procedures." *United States v. Archibald,* 734 F.2d at 941.

The Second Circuit "agree[d] with the [district] court that there was no obligation to stage a lineup, but there was, however, an obligation to ensure that the in-court procedure here did not simply 'amount to [ ] to a "show-up." ' " *Id.* The Second Circuit continued:

> [Defendant's] request should not have been dismissed so quickly or so absolutely by the trial court. A fairly short delay of proceedings was all that would have been required to rearrange the seating in the courtroom and to secure the presence of some people of the defendant's approximate age and skin color. While it was not necessary for the court to conduct a true *Wade*-type of lineup, these relative minor steps were required to ensure that the identification was not unfair. The in-court identification procedure utilized here was so clearly suggestive as to be impermissible, however traditional it may be.

*Id.* at 942–43. In support of its finding that the circumstances were "obviously suggestive," the court noted that "[o]ne of the three witnesses who identified [defendant] stated on cross-examination that she 'had the feeling that he would be sitting next to' the defense lawyer in the courtroom." *Id.* at 943.

On rehearing, the Second Circuit clarified:

> We wish to make it clear that in respect to that portion of our opinion relating to in-court procedures for identification

that special procedures are necessary only where (1) identification is a contested issue; (2) *the defendant has moved in a timely manner prior to trial for a lineup;* and (3) despite that request, the witness has not had an opportunity to view a fair out-of-court lineup prior to his trial testimony. . . .

*United States v. Archibald,* 756 F.2d 223, 223 (2d Cir.1984) (emphasis added).

## B. Because Bond Did Not Request A Line–Up Pretrial, He Would Not Be Entitled to Relief Under Archibald

■ Even if *Archibald* was considered to establish constitutional standards applicable on habeas corpus review of a state conviction, which we address below, Bond would not be entitled to habeas relief. *Archibald* made clear that its holding only applied if "the defendant has moved in a timely manner *prior to trial* for a lineup." *United States v. Archibald,* 756 F.2d at 223; *see also United States v. Brown,* 699 F.2d at 594; *United States v. Campbell,* 581 F.2d at 28. Here, based on the record before the Court, Bond did not request a lineup for Mary Noble until trial had already commenced. Thus, Bond did not satisfy the *Archibald* requirement of a pretrial motion for a lineup.

## C. Archibald Is Not Good Law, Particularly On Habeas Review of A State Conviction

■ The Court notes that *Archibald* (and the earlier Second Circuit decision in *Brown* ) involved federal criminal prosecutions.[7] Based on a "Westcheck," in the

---

(1977), to the effect that "only the apparent weakness" of "the perfunctory type of identification where the defendant is sitting at the counsel table" at trial, "along with its traditional character, saves it from condemnation as being itself impermissibly suggestive."

Finally, *Archibald* cited *United States v. Kaylor,* 491 F.2d 1127, 1131 (2d Cir.1973), *vacated,* 418 U.S. 909, 94 S.Ct. 3201, 41 L.Ed.2d 1155 (1974), for the proposition

that an in-court identification that amounted to a "show up" was not per se inadmissible, but depended on the totality of the circumstances.

7. One commentator has called *Archibald* "the high-water mark of protection afforded to suggestive in-court identifications." Evan J. Mandery, "Legal Development: Due Process Considerations of In–Court Identifications," 60 Alb.L.Rev. 389, 402 (1996).

fifteen years since *Archibald*, *Archibald* has not been applied by the Second Circuit, any district court in this Circuit, or any other federal court, on a habeas corpus review of a state trial identification by a witness who had not made a pretrial identification. It seems likely, therefore, that the Second Circuit's decision in *Archibald* was based not on any constitutional requirement but on the Second Circuit's supervisory authority over federal criminal trials.

The Court further believes that the fifteen year old *Archibald* decision may no longer be good law, in light of subsequent Supreme Court and Second Circuit developments in the law applicable to pretrial and in-court identifications.

First, as the Second Circuit noted in *Archibald*, in-court identification, despite its suggestiveness, is "traditional." *United States v. Archibald*, 734 F.2d at 941. While the parties here have not presented any statistics to the Court as to how often an in-court identification is not preceded by a pretrial identification procedure, the Court believes that such a situation is not uncommon. While stating in one breadth that a pretrial lineup is not required, *id.* at 942–43, the Second Circuit's *Archibald* decision effectively would require there to be a lineup before an initial in-court identification if the defendant requests one before trial, despite the tradition of in-court identification.[8] *United States v. Archibald*, 756 F.2d at 223.

■ Moreover, the language, and logic, of *Archibald* would seem to extend to the situation where a "suggestive" pretrial identification procedure has occurred. *Archibald* held that "special procedures" are

required where requested by defendant before trial and "the witness has not had an opportunity to view a *fair* out-of-court lineup prior to his trial testimony." *United States v. Archibald*, 756 F.2d at 223 (emphasis added). If "special procedures" are necessary to avoid suggestive in-court identifications for a witness who has not seen the defendant since the crime, they would seem to be just as necessary, if not more so, where the witness has seen the defendant in an impermissibly suggestive pretrial identification procedure. Thus, the logical extension of *Archibald* is to require there to be a new and "fair" lineup (or some other "special procedure")[9] where a pretrial identification has been found to be the result of impermissibly suggestive procedures. Supreme Court and Second Circuit case law, however, does not so require; rather, if there was an impermissibly suggestive pretrial identification procedure, in-court identification will be permitted (without a new and fair lineup) if found to be "independently reliable."

Thus, in order to evaluate the constitutional permissibility of in-court identification testimony based on out-of-court identification procedures, the Second Circuit has adopted a two-step inquiry based on applicable Supreme Court precedents:

The Supreme Court has established a two-step inquiry for evaluating the constitutional permissibility of in-court identification testimony based on out-of-court identification procedures. [Step 1:] That inquiry "requires a determination of whether the identification process was impermissibly suggestive and, if so, whether it was so suggestive as to raise

---

**8.** And if defense counsel does not so request, will that lead to claims of ineffective assistance of counsel? For a discussion of the strategic reasons not to request any "special procedures" but just to argue the weakness of in-court identifications, *see, e.g., United States v. Matthews*, 20 F.3d 538, 547 (2d Cir.1994).

**9.** Bond's case is an example of the procedural difficulty of seating the defendant in the spec-

tator section at trial with "people of the defendant's approximate age and skin color." *United States v. Archibald*, 734 F.2d at 942–43. The Court believes that it is not uncommon for there to be few spectators at most trials to serve as such "fillers." (*See* Tr. 144, no spectators at Bond's trial.) Thus, in practical terms, *Archibald* in most cases would require the holding of a pretrial lineup.

'a very substantial likelihood of irreparable misidentification.' "

[Step 2:] If pretrial procedures have been unduly suggestive, a court may nonetheless admit in-court identification testimony if the court determines it to be independently reliable. The court should consider the reliability of the identification in light of the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of [the witness'] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself. *For both pretrial and in-court identifications, the linchpin of admissibility is reliability.* However, if impermissibly suggestive procedures are not employed, "independent reliability is not a constitutionally required condition of admissibility, and the reliability of the identification is simply a question for the jury."

*United States v. Wong,* 40 F.3d 1347, 1359 (2d Cir.1994) (emphasis added & citations omitted; citing, *inter alia, Manson v. Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977), & *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972)), *cert. denied,* 514 U.S. 1113, 115 S.Ct. 1968, 131 L.Ed.2d 858 (1995); *accord, e.g., Dunnigan v. Keane,* 137 F.3d 117, 128 (2d Cir.), *cert. denied,* — U.S. —, 119 S.Ct. 101, 142 L.Ed.2d 81 (1998); *Yearwood v. Keane,* No. 95–2404, 101 F.3d 685 (table), 1996 WL 282134 at *1 (2d Cir. May 29, 1996); *United States v. Eltayib,* 88 F.3d 157, 167 (2d Cir.), *cert. denied,* 519 U.S. 1045, 117 S.Ct. 619, 136 L.Ed.2d 543

(1996); *United States v. Thai,* 29 F.3d 785, 807–08 (2d Cir.), *cert. denied,* 513 U.S. 977, 115 S.Ct. 456, 130 L.Ed.2d 364 (1994); *United States v. Butler,* 970 F.2d 1017, 1021 (2d Cir.), *cert. denied,* 506 U.S. 980, 113 S.Ct. 480, 121 L.Ed.2d 386 (1992).[10]

As the Second Circuit emphasized in *United States v. Matthews,* "where the circumstances of either a pretrial or an at-trial identification are suggestive, reliability is the linchpin for determining admissibility.... Even an identification at trial under circumstances that are tantamount to a showup is 'not per se inadmissible, but rather depend[s] upon the "totality of the circumstances." ' " *United States v. Matthews,* 20 F.3d at 547 (quoting *United States v. Archibald,* 734 F.2d at 942); *see also, e.g., United States v. Kaylor,* 491 F.2d at 1131. The Second Circuit's *Matthews* opinion indicates to this Court that, at least as to state habeas petitions, even if Bond had triggered *Archibald* with a pretrial as opposed to at-trial request for "special procedures" for Mary Noble's at-trial identification testimony (and there is no evidence before the Court that Bond made any such pretrial request), *Archibald* would not require the Court to grant the petition; rather, the Court would be required to weigh the corrupting effect of the in-court identification procedures with the identification reliability factors set out by the court in *Wong* and similar cases. *See United States v. Matthews,* 20 F.3d at 547; *United States v. Estremera,* 531 F.2d at 1111–12 (cited in *Archibald,* 734 F.2d at 943 n. 2) (whether trial court abused discretion in denying lineup before trial identification "requires us to consider all relevant circumstances"); *Chapman v. Meachum,* 790 F.Supp. 63, 66–67 & n. 4 (D.Conn.) (Cabranes, D.J.) (applies *Biggers* factor to

---

**10.** *See also, e.g., Roldan v. Artuz,* 97 Civ. 2562, slip op. at 21 (S.D.N.Y. July 22, 1999) (Peck, M.J.); *Santiago v. New York,* 97 Civ. 5076, 1998 WL 803414 at *2 (S.D.N.Y. Oct. 13, 1998); *United States v. Williams,* 999 F.Supp. 412, 414–15 (W.D.N.Y.1998); *United States v. Frank,* 97 Cr. 269, 1998 WL 292320 at *1–3

(S.D.N.Y. June 3, 1998); *Connolly v. Artuz,* No. 93 CV 4470, 1995 WL 561343 at *4 (E.D.N.Y. Sept. 15, 1995); *United States v. Brown,* 94 Cr. 631, 1995 WL 464956 at *3 (S.D.N.Y. Aug. 7, 1995); *Boles v. Senkowski,* 878 F.Supp. 415, 420–21 (N.D.N.Y.1995).

initial in-court identification), *aff'd mem.*, 979 F.2d 846 (2d Cir.1992).

Decisions in other circuits explicitly hold that admissibility of an · initial in-court identification (*i.e.*, not following a prior pretrial identification) is to be based on the totality of the circumstances, including the five *Neil v. Biggers* reliability factors. *See, e.g., United States v. Rogers*, 126 F.3d 655, 658 (5th Cir.1997) (applies five *Neil v. Biggers* factors to suggestive initial in-court identification); *United States v. Murray*, 65 F.3d 1161, 1168–69 & n. 6 (4th Cir.1995) ("Based on the totality of the circumstances, we agree that although the Government allowed the witnesses to see [defendant] seated at the defense table prior to their testimony, it did not create a substantial likelihood of irreparable mis-identification.... [Defendant] presents no evidence of a likelihood of misidentification other than the fact that both witnesses saw him seated at the defense table prior to testifying."); *United States v. Hill*, 967 F.2d 226, 230–32 (6th Cir.) ("We hold that the *Biggers* analysis applies to such [initial] in-court identifications for the same reasons that the analysis applies to impermissibly suggestive pretrial identifications."), *cert. denied*, 506 U.S. 964, 113 S.Ct. 438, 121 L.Ed.2d 357 (1992); *United States v. Rundell*, 858 F.2d 425 (8th Cir. 1988) (applies *Biggers* factors to initial in-court identifications); *Code v. Montgomery*, 725 F.2d 1316, 1319–20 (11th Cir.1984) (applies *Neil v. Biggers* factors to in-court identification where there was no pretrial

identification; while it "is unfortunate that no pretrial identification procedures were undertaken, ... failure to hold a pretrial lineup does not violate due process.").[11]

The Ninth Circuit's standard is even more prosecution-friendly, holding "that a district court's denial of a request for an in-court line-up is reviewed for an abuse of discretion" which "occurs only if the resulting in-court identification procedures are so ' "unnecessarily suggestive and conducive to irreparable misidentification" as to amount to a denial of due process of law....".'" *United States v. Domina*, 784 F.2d 1361, 1369 (9th Cir.1986), *cert. denied*, 479 U.S. 1038, 107 S.Ct. 893, 93 L.Ed.2d 845 (1987). The Ninth Circuit emphasized that "[t]here is no constitutional entitlement to an in-court lineup or other particular method of lessening the suggestiveness of in-court identification, such as seating the defendant elsewhere in the room. These are matters within the discretion of the [trial] court." *Id.* The Ninth Circuit explained the difference between an in-court identification based on a suggestive ·pretrial identification and an initial in-court identification in the jury's presence:

> The concern with in-court identification, where there has been suggestive pretrial identification, is that the witness later identifies the person in court, not from his or her recollection of observations the time of the crime charged, but

---

**11.** *See also, e.g., Satcher v. Netherland*, 944 F.Supp. 1222, 1292–93 (E.D.Va.1996) ("This case presents a slightly different scenario than most identification cases. Generally, the in-court identification follows a constitutionally suspect pretrial photographic lineup or show-up. In this case, the in-court identification of the defendant followed a proper pretrial lineup during which the victim selected an individual other than the defendant as her attacker.... Here, ... the challenge is that the two-day jury selection process during which the victim arrived at her identification of [defendant] created the suggestive environment which rendered invalid the subsequent in-court identification testimony. Notwithstanding this slightly different factual scenario, the

Supreme Court's two-part analysis under *Biggers* and *Manson* supplies the controlling test here. The Fourth Circuit has consistently applied the *Biggers* analysis in situations where there is no out-of-court identification offered at trial and where the Government's identifying witness is allowed to see the defendant seated at the defense table prior to their testimony.... [W]here there is no improper pretrial identification, but where the challenge to the identification focuses on the suggestive environment of the courtroom, the issue is whether, under the 'totality of the circumstances,' the in-court presentation ... created a substantial likelihood of misidentification.") (citations omitted), *rev'd on other grounds*, 126 F.3d 561 (4th Cir.1997).

from the suggestive pretrial identification.... Because the jurors are not present to observe the pretrial identification, they are not able to observe the witness making that initial identification. The certainty or hesitation of the witness when making the identification, the witness's facial expressions, voice inflection, body language, and the other normal observations one makes in everyday life when judging the reliability of a person's statements, are not available to the jury during this pretrial proceeding. There is a danger that the identification in court may only be a confirmation of the earlier identification, with much greater certainty expressed in court than initially.

When the initial identification is in court, there are different considerations. The jury can observe the witness during the identification process and is able to evaluate the reliability of the initial identification.

*Id.* at 1368. " 'Counsel can both cross-examine the identification witnesses and argue in summation as to factors causing doubts as to the accuracy of the identification—including reference to both any suggestibility in the identification procedure and any countervailing testimony....' " *Id.* at 1369.[12] *Domina*'s approach has been followed by other courts. *See, e.g.,*

*United States v. Ramirez–Pinon,* No. 97–2374, 153 F.3d 729 (table), 1998 WL 458576 at *4–5 (10th Cir. Aug. 4, 1998); *United States v. Davis,* 103 F.3d 660, 670 (8th Cir.1996) ("We agree with the Ninth Circuit's assessment that '[t]here is no constitutional entitlement to an in-court line-up or other particular methods of lessening the suggestiveness of in-court identification.... These are matters within the discretion of the court.' ") (quoting *Domina* ), *cert. denied,* 520 U.S. 1258, 117 S.Ct. 2424, 138 L.Ed.2d 187 (1997); *United States v. Robertson,* 19 F.3d 1318, 1323 (10th Cir.) (where other evidence against defendant is strong, "[i]n such circumstances, as the *Domina* court noted, we are less likely to find abuse of discretion in permitting the in-court identification.... This principle has also been applied by courts in the traditional *Biggers–Brathwaite* setting."), *cert. denied,* 513 U.S. 906, 115 S.Ct. 271, 130 L.Ed.2d 189 (1994); *State v. Clausell,* 121 N.J. 298, 580 A.2d 221, 235 (1990).

**D. Applying the *Neil v. Biggers* Factors to the In–Court *Identification, Bond Is Not Entitled to Habeas Relief***

▪ The Court need not decide if the Second Circuit today would follow the Ninth Circuit's *Domina* abuse of discretion standard, which is the most generous

---

**12.** In summation, Bond's counsel argued to the jury that Mary Noble's identification of Bond was unreliable. (*See generally* Tr. 446–48, 456.) First, he argued that Mary had testified that she had to contend with the light "in her eyes. So she put on dark glasses and that the incident took place across the street and she was looking down" from a second-floor fire escape. (Tr. 446.) Second, he argued that Mary had testified that was able to see only "part of [the perpetrator's] face," and that she "didn't remember" whether she told the police that she wasn't able to identify the perpetrator. (Tr. 446–47.) Third, he argued that "she wasn't called to view a line-up." (Tr. 447, 456.) Fourth, defense counsel argued that Mary had testified that

> she was expecting to see the guy who did it. You see—she had a big choice. There is one fellow sitting by the Defense Counsel. Now, I am not saying to you again that this

woman took the stand and deliberately misrepresented the facts, but I am saying to you when she came into court, she wanted to identify the guy. She thought he did it. She wants him put away. He is the guy who molested her daughter.

(Tr. 447–48.) Also,

> she told the police, "I wasn't able to identify him anyway." She changed her mind when she got to the courtroom, knew this was the guy charged and I am sure, in all honesty, when she saw him in court, that's the guy.
>
> We put another guy in the same situation, she would probably recognize him again.

(Tr. 456.)

Thus, as suggested in *Domina*, Bond's attorney used both cross-examination and summation to attack Mary's in-court identification of Bond.

to the prosecution, because even under the *Neil v. Biggers* reliability factors, the state trial court's admission of Mary Noble's trial identification of Bond did not constitute constitutional error.

First, Mary explained how she saw Bond during commission of the crime. (Tr. 164–71.). Mary testified that she "got out on the fire escape ... to get closer." (Tr. 166.) Her distance from the attacker was only "about twenty-two feet." (Tr. 177.) Mary was able to observe Bond's identity clearly when "he fell ... on his back, so he was looking straight up." (Tr. 170.) Mary also observed and described Bond's jacket in detail. (Tr. 172) Mary testified about other details of her observation of Bond during the crime:

> His hair is not the same, but his face is the same.... He had more hair. He had like—it was more like—it looks like an uncombed afro.... [H]e seemed to be very frightened. His eyes looked like—he looked like they were about to explode. They were so wide. His mouth was open.

(Tr. 171–72.) These facts all show that Mary had an excellent opportunity to see the perpetrator's face. *See, e.g., Yearwood v. Keane,* No. 95–2404, 101 F.3d 685 (table), 1996 WL 282134 at *1 (2d Cir. May 29, 1996) ("During the assault and robbery, the victim ... looked his assailant in the face for up to six seconds," which was among the factors that "favored the finding of independent reliability"); *United States v. Wong,* 40 F.3d at 1360 (looking at defendant's face for 2–3 seconds "was sufficient for identification"); *United States v. Mohammed,* 27 F.3d 815, 821–22 (2d Cir.) (observation "for approximately thirty seconds" was "ample opportunity" to make a reliable identification), *cert. denied,* 513 U.S. 975, 115 S.Ct. 451, 130 L.Ed.2d 360 (1994); *United States v. Butler,* 970 F.2d 1017, 1020, 1021 (2d Cir.) (identification upheld where witness viewed perpetrator for less than three minutes), *cert. denied,* 506 U.S. 980, 113 S.Ct. 480, 121 L.Ed.2d 386 (1992); *United States v. Jacobowitz,*

877 F.2d 162, 168 (2d Cir.) (the fact that the witness "had been in [the defendant's] presence for approximately five minutes in good lighting ... and saw him again briefly when she [made a delivery] to his room" was among the factors that led to the court's conclusion that the witness "had had a sufficient opportunity to observe [the defendant] and sufficient reason to remember him"), *cert. denied,* 493 U.S. 866, 110 S.Ct. 186, 107 L.Ed.2d 141 (1989); *Meadows v. Kuhlmann,* 812 F.2d 72, 76 (2d Cir.) (witnesses' identifications were independently liable based in part on the fact that their view was "unobstructed, at close range for a period of time ranging from two to five minutes during the commission of the respective crimes"), *cert. denied,* 482 U.S. 915, 107 S.Ct. 3188, 96 L.Ed.2d 676 (1987); *United States v. Yanishefsky,* 500 F.2d 1327, 1330 (2d Cir.1974) ("While it is true that [the witness] said that he identified appellant 'through a side face as she was going out,' there is no evidence in the record indicating that his view of her was inadequate for him to formulate a clear visual and mental impression of her."); *United States ex rel. Cummings v. Zelker,* 455 F.2d 714, 715, 717 (2d Cir.) (witness' identification reliable where "she stared directly at his face for 15 seconds"), *cert. denied,* 406 U.S. 927, 92 S.Ct. 1800, 32 L.Ed.2d 128 (1972); *United States ex rel. Phipps v. Follette,* 428 F.2d 912, 916 (2d Cir.) ("His 20 to 30 second observation was much more than a fleeting glance, as anyone who watches the second hand of a clock sweep by for that period can attest."), *cert. denied,* 400 U.S. 908, 91 S.Ct. 151, 27 L.Ed.2d 146 (1970).

Second, Mary was paying close attention, because she was concerned about her daughter's safety. (*E.g.,* Tr. 164–65.) *See, e.g., Yearwood v. Keane,* 1996 WL 282134 at *1 ("As a robbery victim, [witness] had an interest in the event and reason to pay attention to his attacker."); *United States v. Wong,* 40 F.3d at 1360 (finding witness's degree of attention to be "very high" while she feared for her own and her husband's

safety); *United States v. Concepcion*, 983 F.2d 369, 378 (2d Cir.1992) ("nature of events" in struggle and shooting "was such as to attract and hold [the witnesses'] attention"), *cert. denied*, 510 U.S. 856, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993); *Gonzalez v. Hammock*, 639 F.2d 844, 847 (2d Cir.1980) ("Although [the witness] was not a trained observer of people, such as a police officer, there is little doubt that his attention would be riveted on a man who was pulling a shotgun from a bag."), *cert. denied*, 449 U.S. 1088, 101 S.Ct. 880, 66 L.Ed.2d 815 (1981).

Third, the police never asked Mary to describe the attacker before trial (Tr. 187–89), so that factor is neutral, or perhaps slightly in Bond's favor. *See, e.g., United States v. Mohammed*, 27 F.3d 815, 822 (2d Cir.) ("The only factor that cuts in [defendant's] favor is that [the witness] failed to give the police a detailed description of his assailant prior to the identification"), *cert. denied*, 513 U.S. 975, 115 S.Ct. 451, 130 L.Ed.2d 360 (1994).

Fourth, Mary's trial testimony showed no hesitation and a high degree of certainty as to her identification of Bond. (Tr. 165–71, quoted at length at pages 3–4 above.) *See, e.g., United States v. Hill*, 967 F.2d 226, 233 (6th Cir.), *cert. denied*, 506 U.S. 964, 113 S.Ct. 438, 121 L.Ed.2d 357 (1992).

Fifth, although the fact that ten months had elapsed between the crime and trial (*e.g.*, Tr. 31, 134, 160), favors Bond, that is outweighed by the other factors. *E.g., United States v. Wong*, 40 F.3d at 1360 (ten months between crime and identification, "while a factor militating against reliability, may be outweighed"); *United States v. Maldonado–Rivera*, 922 F.2d 934, 976 (2d Cir.1990) ("And though [the defendant] argues that the interval of nearly a year between [the witness'] last meeting with [the defendant] and her identification of his photograph makes that identification suspect, the length of that interval is outweighed by" other factors that indicated her identification was reli-

able), *cert. denied*, 501 U.S. 1211, 111 S.Ct. 2811, 115 L.Ed.2d 984 (1991); *United States v. Rundell*, 858 F.2d 425, 427 (8th Cir.1988) (eight month delay is negative factor but "this factor alone does not render the [initial] in-court identifications so unreliable as to be inadmissible.... Rather, the passage of time was a proper item for cross-examination and closing argument, . . . and a circumstance for the jury to consider in assessing the weight to be given the identification testimony."); *see also, e.g., Neil v. Biggers*, 409 U.S. at 201, 93 S.Ct. at 383 ("a lapse of seven months between the [crime] and the confrontation . . . would be a seriously negative factor in most cases"); *United States v. Jacobowitz*, 877 F.2d 162, 168 (2d Cir.) (ten month gap was a "longer delay than is desirable"), *cert. denied*, 493 U.S. 866, 110 S.Ct. 186, 107 L.Ed.2d 141 (1989); *cf. United States v. Eltayib*, 88 F.3d 157, 167 (2d Cir.) ("The fact that the identification took place ten days after [the witness] first saw [defendant] (factor 5) does not seem probative one way or the other."), *cert. denied*, 519 U.S. 1045, 117 S.Ct. 619, 136 L.Ed.2d 543 (1996).

Considering all the factors, the Court finds Mary Noble's trial identification of Bond to be reliable, despite the inherent suggestiveness of the traditional in-court identification. The weight to be given her identification of Bond, therefore, was for the jury. *See, e.g., Dunnigan v. Keane*, 137 F.3d 117, 128 (2d Cir.) (" 'Short of th[e] point' at which the court must conclude, after considering these [*Biggers*] factors, that 'under all the circumstances of th[e] case, there is a very substantial likelihood of irreparable misidentification,' the presence of some element of untrustworthiness goes only to the identification's weight, not to its admissibility."), *cert. denied*, —— U.S. ——, 119 S.Ct. 101, 142 L.Ed.2d 81 (1998); *United States v. Butler*, 970 F.2d 1017, 1021 (2d Cir.) ("Any flaws in these identifications went to their weight rather than their admissibility," upon application of all the *Biggers* factors),

*cert. denied,* 506 U.S. 980, 113 S.Ct. 480, 121 L.Ed.2d 386 (1992); *United States v. Hill,* 967 F.2d at 233 ("consideration of all of these [*Biggers*] factors taken together leads us to conclude that the identification in this case ... was reliable enough to be admissible.").

Therefore, Bond's only exhausted and not defaulted claim, regarding Mary Noble's in-court identification, lacks merit.

## *CONCLUSION*

For the reasons set forth above, the Court should deny Bond's habeas corpus petition.

## *FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Lawrence M. McKenna, 500 Pearl Street, Room 1640, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge McKenna. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL—CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.

1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).